

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00066-CV

_____

IN THE INTEREST OF A.B.-G. AND A.B.-G., CHILDREN

---

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-583258-15

---

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

After a bench trial, the trial court terminated Mother's parental rights to her then-11-year-old twins, Austin and Angela.[1] On appeal, Mother asserts that the evidence does not support the trial court's best-interest and grounds findings. We affirm.

### The Findings

The Court found by clear and convincing evidence that

- termination of the parent–child relationship between Mother and the children was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

- Mother had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being. *See id.* § 161.00l(b)(l)(D).

- Mother had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See id.* § 161.00l(b)(l)(E).

- Mother had been convicted or had been placed on community supervision, including deferred-adjudication community supervision, for being criminally responsible for the death or serious injury of a child under penal code section 22.04. *See id.* § 161.00l(b)(l)(L); Tex. Penal Code Ann. § 22.04 ("Injury to a Child, Elderly Individual, or Disabled Individual").

---

[1]We identify the children by fictitious names and their mother simply as Mother. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

**Background**

**A. Procedural**

**1. The Department removed Mother's children.**

Nine-year-old Austin and Angela came into the Department of Family and Protective Services' care in November 2016 after Austin appeared at school with a bruised eye and attributed it to Mother's hitting him with a belt. The school nurse observed additional bruising on Austin's back and arm.

**2. Forensic interviewers met with the children.**

**a. Austin described Mother's hitting him with a belt.**

A forensic interviewer at the Alliance for Children recorded her November 2016 interview with Austin during which he said that Mother had hit him "hard" with a leather belt in the face, striking his eye and causing it to swell. Initially, he described how Mother had hit him once on the back and how his backbone felt like it had been broken; later he said that she had hit him several times on the back. When shown photos of his injuries, Austin acknowledged other marks that Mother had left on his arms and shoulder from the same incident.

Austin reported only one other similar incident, in which Mother had struck him twice on the palm of his hand. He acknowledged also having seen Mother give his sister Angela a "whupping." Despite everything, Austin expressed concern about Mother's getting in trouble.

**b. Angela also described Mother's beltings.**

A different forensic interviewer at the Alliance for Children interviewed Angela on the same day. Angela explained that Austin had misbehaved at the mall and that a few days later Mother had hit him with a belt. While Angela was in the bathroom at their home, she heard Austin screaming and Mother telling him to sit still. Angela then heard approaching footsteps; Mother entered the bathroom, swung the belt onto a rack, and helped Angela with her bath. The next morning, Angela saw that Austin had a big bump on his eye, and when she asked him what had happened, Austin's only response was, "Whupping."

Angela explained that when Mother treated Austin this way, Angela usually hid in her bedroom. When asked how often she had to hide, she responded, "A lot." She hid because she was scared and because she hated it when Mother took a belt to Austin.

And Austin was not the only child whom Mother hit with a belt. Angela described a time when she was riding her scooter and talking too much: Mother took off her belt, chased Angela into a parking lot, and struck her in the back. After Angela tried to hide in the bushes, Mother "whipped her belt way up high and swung through the bush," leaving a "scar" on the side of Angela's face. On another occasion, Angela took the last slice of a pizza, so Mother grabbed the belt and struck her, leaving marks

on her arm and leg. Another time, Mother hit Angela with a metal spatula, causing Angela to bleed; after that, Mother stopped using a spatula.[2]

### 3. After being indicted, Mother pleaded guilty to injury to a child.

Indicted in 2017 for injury to a child, a third-degree felony, Mother entered a plea-bargain agreement and was placed on deferred-adjudication community supervision.

### 4. Mother's monitored return failed.

In April 2018, the trial court signed an "Order for Monitored Return" that set out a transitional period before placing the children back in Mother's home. But during the specified period, the trial court vacated the monitored-return order.[3]

### 5. The Department then sought termination.

The case proceeded to a bench trial in February 2019.

## B. Evidentiary

### 1. Mother had a history of physically abusing her oldest child.

Mother had three children. Austin and Angela, the youngest, had an older half-sibling, Sister, who was 22 years old at the time of trial.

---

[2]Both recorded interviews were admitted at trial.

[3]At trial, the Department did not explain why the transitional monitored return failed, but the affidavit supporting the Department's "Motion to Vacate the Transition Return" mirrored the same concerns expressed at trial as the bases for terminating Mother's parental rights.

Mother had a history with the Department involving Sister, too: in 2007, the Department removed Sister (then aged 10 or 11) due to negligent supervision, and in 2009 after Mother had completed her services, the Department returned Sister to Mother. But four months later the Department removed Sister again, this time for physical abuse. After that second removal, Sister remained in foster care—at Sister's own request—until she aged out. Mother's psychological evaluation reported that Sister "had made repeated outcries of serious physical and psychological abuse from her mother" and that "[i]t [was] unusual for a child not to want to return to a parent[,] and this [spoke] volumes."

### 2. Mother acknowledged physically abusing Austin.

Regarding Austin and Angela's November 2016 removal, Mother acknowledged striking Austin with a belt, pleading guilty to injury to a child, and being placed on deferred-adjudication community supervision. And at trial, Mother agreed that striking Austin was not discipline but was, instead, child abuse.

### 3. Mother completed most of her services, but doubts persisted.

At trial, the Department did not dispute that Mother had completed most of her services, and Mother assured the court that she would not hit her children again: "My plan is to not even ever think about spanking my children ever again. . . . I have verified that with several police officers—that it is the law. I never will spank my children ever again." From her services, Mother asserted that she had learned a new approach: "My plan is to use communication to speak with them and let them know

6

and to reiterate again and communicate and reiterate and talk." But Mother also admitted that five times since 2006 the Department had found "reason to believe"[4] that she had physically abused her children, that each time she had promised not to do it again, and that she did it again anyway. When asked why anyone should believe her now, Mother responded, "[S]panking is not against the law. However, spanking does bring about an environment where CPS is called, the police are called[,] and my children are removed from the home." She continued, "So going through that several times, I have learned other ways of communication . . . ."

But several witnesses expressed doubt that Mother had changed.

For example, Mother's probation officer denied seeing anything showing that Mother had learned to think and behave differently: "[E]verything [Mother] would say sounded like [a] textbook answer. It appeared that she wasn't grasping what I was asking her. . . . She wasn't giving any examples of what someone would learn." Further, Mother was not taking responsibility for hitting Austin; instead, she blamed Austin for moving and not being still. The probation officer explained that admitting to having done something and taking responsibility for it were not necessarily the same: "Externalizing blame. Blaming someone else for their actions. There's a

---

[4]After investigating a child-abuse or -neglect allegation, the Department assigns one of five possible dispositions: (1) reason to believe (based on a preponderance of the evidence), (2) ruled out, (3) unable to complete, (4) unable to determine, or (5) administrative closure. 40 Tex. Admin. Code § 700.511(b) ("Tex. Dep't of Family & Protective Servs., Disposition of the Allegations of Abuse or Neglect").

criminal thinking error[] . . . if they minimize it or blame someone else, then they're not taking responsibility for their actions."

The caseworker, too, said that Mother blamed the children: "At one point in December [2018] when we went over why the children came into care, she told me if her children were . . . well-mannered children, we wouldn't be in this situation." The caseworker doubted that Mother had changed: "[Mother] would tell me that that was her way of disciplining the children and that CPS wanted a perfect parent. She never really—from my conversations with her, she never really grasped that concept." Although Mother now used time-outs, which the caseworker commended, Mother still disciplined in ways that the caseworker found unacceptable. For example, Mother had forced Austin to do push-ups in a public area, and during Mother's last visit with the children, Mother had ended the visit early when the children disobeyed her.

The push-up incident happened at a McDonald's only a month before trial. The court-appointed special advocate (CASA worker) described it: "[Mother] was upset with [Austin,] and she made him get on the middle of the floor . . . and give her 20 pushups, and [Austin] was crying[,] and obviously he was embarrassed[,] and people saw it . . . ." This happened not once but twice. "[W]hen [Austin] finished his pushups and came back, [Mother] had him do it again for something else she was upset with."

The CASA worker was concerned that physical abuse would continue. When asked to explain why, she responded, "The way that [Mother] reacts to the children.

8

She can get real angry with them[,] and she doesn't physically do anything to them, but she becomes agitated and yells at them there at the visit."

Overall, the Department did not think the children would be safe returning to Mother.

**4. Mother's mental-health issues made her resist change.**

Mother's mental-health therapist thought that Mother had made progress "for her abilities" but opined that Mother needed to continue counseling. The therapist added that "CPS usually requests bigger changes, bigger progress in a quicker time frame than I thought [Mother] was able to make."

A lack of intelligence was not the problem; Mother's therapist described her as "an intelligent lady who . . . talk[s] a good game" but nonetheless as having "a serious lack of insight into and understanding of her own behaviors" and as presenting "an extremely defensive profile." According to the therapist, "She prefers to give cerebral responses and avoids discussing her emotional reactions or how she feels about situations." In the therapist's psychological evaluation, she explained why Mother's ability to change was effectively stunted:

> Although [Mother] attempted to present[] herself in a positive manner, some of the scales [are] still elevated and indicate her personality profile is associated with people who tend to think everyone is working against her, who have major trust issues, and are described by others as hypersensitive, resistant, and angry at times. People who produce such profiles are often viewed as guarded and distrustful. The profile is also associated with people who may have a marked overreaction to minor stress. They tend to have difficulty expressing their emotions in an adaptive manner and may alternate between being over-controlled and

direct to having under-controlled emotional outbursts. [Mother] tends to make excuses for her poor decision making and accepts little responsibility for CPS being involved in her life once again. . . .

When a person tries to create a favorable impression of herself and takes a guarded and defensive approach to the test taking, this results in limited understanding of the person because they were not open to the process. . . .

. . . . [Mother] presented as an individual who has little insight into her motivations and shows little awareness of the consequences to others because of her behavior. Excessive disciplining can affect children negatively.

As examples of Mother's lack of insight, the therapist pointed to how Mother answered two incomplete-sentence prompts:

- "If I could change one thing about myself it would be *to be more perfect*."

- "I failed *to prove to CPS that I am not an abusive parent*."

"It is very hard," the therapist concluded, "to help someone when they don't see a need to make changes." And because of Mother's "lack of insight and defenses which keep her stuck," the prognosis for any type of psychological intervention was "poor."

At trial, the therapist testified that Mother would sometimes admit to having abused Sister but later revert to blaming her for what Mother had done. This vacillating did not concern the therapist, though, because that was "somewhat normal behavior" for persons who were "dealing with situations like this" and because Mother's vacillating depended on Mother's mood and on what they were discussing.

Mother told her therapist that she felt the Department was railroading her, and to an extent her therapist tended to agree. The therapist explained that after a parent

10

completes the family-care plan, the Department would usually work toward transitioning the children back to the parent, something the Department did not do with Mother. But the therapist acknowledged that she had never observed Mother during Mother's visits with the children.

**5. Mother's visits with her children sparked emotional-abuse concerns.**

But those persons who had observed Mother interact with her children expressed at trial their concerns that she was abusing them emotionally.

For example, the caseworker testified:

[Mother] would often belittle the children's accomplishments, . . . .

[Mother] would ask—you know, make them go to the restroom even though the children had stated they didn't want to[.]

Being able to have the children drink and pick what they want to eat. Telling them when they should take a drink and when they should not take a drink[.]

Allowing the children to let her know when they were tired of doing a task and no longer wanted to do a task during the visit she— even though the children explained that they no longer wanted to do a certain task, she would disregard what the children were saying and continue on to doing the task.

The CASA worker had similar concerns:

[M]y observations are that mom is still very critical with the children. Her disciplinary actions do not . . . seem to be going towards what we were trying to establish with her that's appropriate[.]

The children's conversations [concern] me.

There are just—there are so many examples from the visits that would lead me to that conclusion[:]

11

[t]he way that she speaks to the children;

[t]he way that she criticizes them;

[t]he way that she tells them that she doesn't believe something that they're saying;

[e]mbarrassing them.

All of these things happened publicly . . . .

The Department's attorney then elicited specific examples from the CASA worker:

Q. Okay. Let's start with your first concern that you identified that she was critical of the children.

Can . . . you think of an example of her being critical of the children . . . ?

A. Back [when the case first started,] she would come into the visit, immediately start examining the children, going through their hair, cleaning out their ears, telling them that they didn't brush their teeth and that they hadn't been putting lotion on. Even though the children would say, yes, they had, she would tell them they hadn't[,] and those were at the early onset, you know—

Q. Couldn't that just be—

A. Criticize their clothes.

Q. Okay. Isn't that just a mother being concerned for the well-being of her children making—

A. Not— well, I'm sorry. Go ahead.

Q. I mean, why wouldn't you describe that as just a mother being concerned for her child ensuring that they are properly caring for their teeth, their hair, their skin?

A. She did it in a way like a gorilla would do his baby.

. . . .

Q. . . . [T]his was something that was addressed later on in the case as well in the transition to monitored return order, you know, specifically those behaviors. What—did you see a change in that over the course of this case?

A. No. She wasn't quite as critical, but at the last few weeks she has returned to being critical again and—

Q. And what example do you have from the last few weeks that indicates to you that there's been a regression or a return to that same behavior?

A. At McDonald's which is where we meet for our visits. They were standing in line, and mom reaches over to [Angela] and starts trying to clean out her ears right up there in line with everyone. You know, [Angela] tells her to leave her alon[e] and pulls away from her—[Angela] does.

[Mother] started talking to them about their teeth. And [Austin] just gets away. He won't let her start grooming on [him]. He will pull away and not let her get that far.

Q. Okay. And. Again, how old are these children?

A. They're eleven.

Q. Okay. I mean, isn't this just part of normal parenting?

A. No.

When the children's guardian ad litem followed up, the CASA worker flatly denied that Mother had shown any improvement:

Q. The last visitation that you had with the mother and the children was when?

A. Yesterday.

Q. Okay. And in the almost two years of visitation with their mom, have you seen any significant change in mother's behavior since June of 2012 [sic] [November 2016] to yesterday afternoon that she has

13

improved or worked on any of the activities that the family therapist was working with her trying to alleviate some of the issues? Do you see any improvement in your opinion?

A. No.

Mother disagreed with these various concerns: "What I call communication, they call emotional abuse."

### 6. Austin's ADHD and Mother's OCD diagnoses shed more light on the family dynamics.

While this case was pending, Austin was diagnosed with ADHD (attention-deficit hyperactivity disorder) and was placed on medication. Although Mother had initially balked at medicating him, at trial she agreed that Austin needed it. Noting Austin's progress in school—he was no longer disruptive, he was listening, and he was on the AB honor roll—Mother said that she trusted the doctors' and the foster parents' judgment.

Also while the case was pending, Mother was diagnosed with an obsessive–compulsive personality disorder. Mother denied that anyone had recommended that she take medication for her OCD but acknowledged that she was receiving individual counseling to address it.

### 7. The children vacillated about returning to Mother's home.

The court heard conflicting testimony about the children's wishes.

### a. The caseworker

Q. What are the desires of [Angela]?

A. [Angela] has stated that she does not want to go back home.

One of the things that has raised a red flag for me was she previously—including last week when I went to go talk to her that she is concerned that once CPS is out of the picture and nobody is in their business, mom will go back to being the old mom and whopping [*sic*] them.

. . . .

Q. Has [Angela] throughout this case expressed different opinions on where she wants to be?

A. Yes.

Q. Is that uncommon for children to do that?

A. No.

Q. [Angela], as far as you can tell, loves her mom?

A. Yes.

Q. As far as you can tell does [Mother] love [Angela]?

A. Yes.

Q. So the fact that [Angela] might say she wants to return to mom, does that surprise you?

A. No.

Q. How recently has [Angela] told you she does not want to go home and she's afraid that her mom will return back to hitting her and her brother once CPS isn't watching?

A. Two days ago when I went to go visit.

. . . .

Q. What are [Austin]'s wishes?

A. [Austin] has stated that he wants to go back to his mom. [Austin] changes his mind often. One week he'll say he wants to stay in the foster home because he feels safe. The next week he'll say he wants to go back with mom.

From what I've noticed from [Austin], it changes depending on if he's in trouble at the foster home or not. [Whenever] he's in trouble because he acted out or gets grounded, then he wants to go with mom.

Q. Now, you indicated that when he states he wants to stay in the foster home it's because he feels safe.

A. Correct.

Q. What are the reasons that he gives of wanting to go back to mom?

A. Because they get to go—he states that they go on field trips and they do activities. Those have really been the only reasons that he's been able to give.

### b. The CASA worker

Q. And what in your opinion are their desires? We'll start with—we'll split them up.

What are [Austin]'s desires in this case?

A. He said he doesn't ever want to go home to her.

Q. And how recently has he made that statement to you?

A. Two weeks ago . . . .

. . . .

Q. And so regarding [Angela], what is your opinion as to what her desires are?

A. When I asked her, I mentioned to her that I had understood that CPS would let her know that there's a possibility that she would not be going home and how did she feel about that[,] and she flipped her head

16

sideways and did a great big giant smile[,] and she said, "I'm glad." And I said, "You sure you're glad?" And she stated, "Yes. I do not want to live with her. I know that she'll hit us again."

### c. Mother

Q. Okay. [Mother], and you've been able to spend quite a bit[] of time with your children, correct?

A. Yes.

Q. Even during this case?

A. Yes.

Q. Have they ever expressed to you that they wanted to come home?

A. Yes.

Q. And—okay. And have they ever expressed to you that they didn't want to come home?

A. No.

## 8. The children's future placement options remained unsettled.

If Mother's parental rights were terminated, the caseworker explained that the children's current foster family was not adoption-motivated but was willing to keep the children until they aged out. According to the caseworker, the children preferred to stay in the foster home but were not adamantly opposed to adoption.

In the same vein, the CASA worker noted that the children had bonded with the foster family and were thriving. About adoption, the CASA worker testified that "[Austin] stated that he was not interested in going home to mom and that if [the foster mother] didn't want to adopt him, he was fine with that just as long as he had

17

nice parents." Angela was also open to being adopted by someone other than her foster parents.

Mother maintained that she had a safe home, stable housing, and lawful employment.

**Standard of Review**

## A. Generally

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(b), § 161.206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). Evidence is clear and convincing if it "will produce in the mind of the trier of

18

fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds (currently up to 21) that are listed in family code section 161.001(b)(1), and (2) termination is in the child's best interest under section 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

Regarding subsection 161.001(b)(1) grounds, the supreme court recently articulated an important qualification: if the trial court finds grounds under subsection (b)(1)(D) or (E)—both of which involve endangering a child's physical or emotional well-being—an appellate court must review the (D) or (E) grounds on appeal because they have potential collateral consequences for other children the parent may have. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing that a prior termination under (D) or (E) is a ground for terminating parental rights to a different child); *In re N.G.*, ___ S.W.3d ___, No. 18-0508, 2019 WL 2147263, at *4 (Tex. May 17, 2019) ("[I]f a court of appeals affirms the termination on either [(D) or (E)] grounds, it must provide the details of its analysis.").[5] Termination may not be based solely on the

---

[5]In that case, the trial court found grounds under (D), (E), and (O); the appellate court affirmed on (O) and declined to address (D) and (E). *N.G.*, 2019 WL 2147263, at *1. The supreme court held that the appellate court erred by not addressing grounds (D) or (E) and also erred in its (O) analysis and so remanded all

child's best interest as determined by the factfinder under section 161.001(b)(2). *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

## B. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved both the particular ground for termination and that termination is in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We also must disregard all evidence that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless

---

three grounds to the appellate court for "further proceedings consistent with this opinion." *Id.* at *4, *6 ("We hold that due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under section 161.001(b)(1)(D) or (E) of the Family Code."). We read *N.G.* as saying that an affirmance under either (D) *or* (E) suffices because an affirmance under one makes the other moot under (M). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing that a prior termination under (D) or (E) is a ground for terminating parental rights to a different child). Regardless of how to interpret the disjunctive, out of an abundance of caution we will analyze both (D) and (E) grounds.

a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor; that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

## C. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support terminating a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In a factual-sufficiency review, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated an alleged ground and that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## Grounds under (D) and (E)

### A. Law

"Endanger" means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The parent's conduct need not be directed at the child nor must the child actually suffer injury in order to be endangered within the statute's meaning. *J.T.G.*, 121 S.W.3d at 125. Moreover, a child can be endangered simply by violence that is directed toward another child in the home. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

Under (D), we examine evidence related to the child's environment to determine if that environment endangered the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. A parent's conduct in the home, including abusive or violent conduct, can create an environment endangering a child's physical and emotional well-being. *Id.*

Under (E), we ask whether evidence exists that the parent's conduct—including acts, omissions, or failures to act—endangered the child's physical or emotional well-being. *Id.* Additionally, (E) requires not just a single act or omission but rather a voluntary, deliberate, and conscious course of conduct. *Id.*

We may conduct a consolidated review of (D) and (E) grounds when the evidence pertaining to both is interrelated, as it is here. *See In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

**B. Discussion**

The record shows that Mother engaged in conduct that endangered Austin's and Angela's physical well-being. Mother admitted to at least five instances of physical abuse, and physical abuse had led to Sister's second removal in 2009. The children's interviews revealed that Mother's striking them with a belt occurred multiple times. In short, Mother engaged in a course of endangering conduct. Because the children lived with Mother, she also created an environment that endangered them physically. *See J.T.G.*, 121 S.W.3d at 125.

The caseworker and the CASA worker also described Mother's micromanaging the children's conduct in demeaning, embarrassing, and age-inappropriate ways and belittling them with repeated criticism. But because the evidence established that Mother engaged in physical abuse, we need not decide whether this additional conduct amounted to emotional abuse. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E) (requiring endangering a child physically or emotionally).

We hold that the evidence sufficed both legally and factually to support the trial court's (D) and (E) findings. *See J.F.C.*, 96 S.W.3d at 265–66 (stating that to be legally sufficient, the evidence must be such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations); *C.H.*, 89 S.W.3d at 25 (stating that to be factually sufficient, on the entire record, a factfinder must be able to reasonably form a firm conviction or belief that the parent violated an alleged

23

ground). We overrule Mother's legal- and factual-sufficiency challenges to the trial court's (D) and (E) findings.

## Grounds under (L)

Having found the evidence legally and factually sufficient under (D) and (E), we need not address grounds under (L). *See N.G.*, 2019 WL 2147263, at *4 n.1; *E.N.C.*, 384 S.W.3d at 803. We thus overrule as moot Mother's evidentiary-sufficiency challenges to the trial court's (L) finding.

## Best Interest

### A. Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative both of the grounds under section 161.001(b)(1) and of best interest under section 161.001(b)(2). *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the factfinder in a termination case may also use in determining the child's best interest include:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

24

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

**B. Discussion**

Mother had a history dating back to 2009 of physically abusing her children, receiving counseling, assuring the Department that she would stop physically abusing the children, and then abusing them again despite the counseling and her assurances. Mother's overbearing and critical parenting raised additional emotional-abuse concerns; at the very least, the caseworker and the CASA worker described toxic—

25

not nurturing—parenting, and Sister's decision nearly a decade earlier to age out of foster care rather than return to Mother's home underscores that Mother's home was an unhealthy one for children.

For mental-health reasons, Mother had difficulty recognizing her conduct as abusive, and she resisted change. Mother's probation officer articulated the difference between Mother's ability to acknowledge striking Austin with a belt and her inability to admit responsibility for it: Mother exhibited criminal-thinking errors by minimizing her conduct and blaming the children for causing her to hit them with a belt. Mother's therapist described her as "stuck" in her thinking and wrote that her prognosis was "poor."

Returning Sister to Mother in 2009 had proved a failure, and the trial court here had already tried a transitional monitored return; it had failed too. Although Austin was ostensibly loyal to Mother, even he recognized that the foster family offered safety, something he did not attribute to Mother. And Angela dismissed any idea that Mother had changed and feared that Mother would resume abusing them "once CPS [was] out of the picture."

If Mother's rights were terminated, the children's future was still burdened with some unanswered questions, but whether they would be physically or emotionally abused were not among them. Austin and Angela were in a foster home where they were bonded to their foster parents and were thriving. Although the foster home was not adoption-motivated, the children were welcomed there until they aged out or were

26

adopted—an option the children were willing to consider. Although Austin and Angela were not in a "forever" home, they were in a safe, stable, and nurturing home where they did not have to fear physical abuse, to endure emotional abuse, or to risk future removals with all the obvious associated uncertainties.

We hold that the evidence suffices both legally and factually to support the trial court's best-interest finding. *See J.F.C.*, 96 S.W.3d at 265–66 (stating the test for legal sufficiency); *C.H.*, 89 S.W.3d at 25 (stating the test for factual sufficiency). We overrule Mother's legal- and factual-sufficiency challenges to the trial court's best-interest finding.

## Conclusion

Having overruled Mother's challenges, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: August 8, 2019

27